UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| LISA KELLY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2: 08-54-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| CITY OF FORT THOMAS, KENTUCKY, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This memorandum addresses issues raised in the Plaintiffs' motion for a preliminary injunction in which they seek to prevent the Defendants from enforcing two ordinances enacted as part of an urban deer management plan. [Record No. 23] Plaintiffs filed a complaint for a declaratory judgment in state court seeking to have the ordinances declared void. [Record No. 1, Ex. 1] After the Defendants removal the action to this Court, the Plaintiffs filed a motion for a preliminary injunction. [Record No. 23] The Defendants filed a memorandum in opposition [Record No. 27] and a hearing was held on November 21, 2008 in Covington. At the conclusion of the hearing, the undesigned denied the Plaintiffs' motion for injunctive relief.

**I.   FACTS**

**A.   Developing the Plan**

This case arises out of the Defendants' response to increased interaction between the residents of Fort Thomas, Kentucky, and the deer population in the area. Between 2003 and 2005, Fort Thomas experienced an average of 9.4 motor vehicle collisions with deer each year. In 2006,

however, that number rose by nearly 40% to 13 car/deer collisions. Due to the increase in traffic accidents as well as property damage caused by deer, city leaders contacted officials at the Kentucky Department of Fish and Wildlife Resources ("KDFWR") concerning ways to reduce the city's increasing deer population.[1] In response, KDFWR officials offered their assistance in preparing a comprehensive deer management plan ("Plan"). [Record No. 23, p. 1]

At the hearing on Plaintiffs' motion for injunctive relief, Ms. Christina Brunjes,[2] Big Game Coordinator with the KDFWR, was called as a witness by the Plaintiffs. Ms. Brunjes testified that the Fort Thomas City Council contacted her regarding their desire to reduce the City's ever-growing deer population. She worked with a number of state and city officials, including Donald Martin, a City Administrative Officer, in evaluating several options to reduce the deer population in Fort Thomas. Before a plan was finally implemented, Ms. Brunjes inspected several areas within the city limits and confirmed that Fort Thomas had evidence of a large deer population. At the hearing, she described the population as "dense." According to Ms. Brunjes, there was close coordination and cooperation between the City and her office concerning the details of the Plan ultimately adopted. This coordination involved other biologists and legal counsel for the KDFWR.

Initially, the state and city officials discussed bringing in USDA sharpshooters to eliminate a portion of the deer population. The parties also discussed using Fort Thomas police officers to shoot a portion of the deer population. However, Ms. Brunjes explained that, before sharpshooters

---

1. At the hearing, Fort Thomas Police Chief Michael Daly testified that the large amount of droppings in area parks and athletic fields was a potential health concern.

2. Ms. Brunjes obtained an undergraduate degree in forest resources from the University of Georgia, a masters degree in wildlife ecology from the University of Georgia, and a Ph.D. in wildlife ecology and management from Texas Tech University. She has 15 years of experience in various types of wildlife management, is a deer hunter, and is familiar with bow hunting, including safety aspects of compound and crossbows.

could be used, some evidence of the extent of the deer problem in the area was required, and that a population survey could be used to provide the supporting information. Ms. Brunjes also testified that a survey was not required after the sharpshooter plan was abandoned in favor of amendment of the existing ordinance to allow arrow discharge. Ms. Brunjes testified that the use of bows and crossbows to eliminate a percentage of the deer population was the most cost-effective and safest way to address the problem. The Plaintiffs offered no evidence to refute this conclusion.

### B. The Plan

The final version of the Plan was drafted by Mr. Martin after numerous discussions with Ms. Brunjes and other state officials with the KDFWR. The Plan included the following three-step approach to deer management: (1) public education about safe driving during deer season and how property owners can prevent deer from damaging landscape; (2) a prohibition on deer feeding; and (3) removal of deer from the city. [Record No. 22, p. 4] The City implemented the Plan by enacting City Ordinance § 91.51 (prohibiting deer feeding) and amending City Ordinance § 95.05 (allowing for the discharge of arrows from bows and crossbows within the city limits).

### 1. § 91.51 – Prohibition on Feeding Deer

Title IX of the Fort Thomas, Kentucky, Code of Ordinances § 91.51 ("§ 91.51") prohibits the feeding of deer within the city limits.[3] Section 91.51 provides:

> (A) No person shall knowingly, purposely or intentionally feed deer, cause deer to be fed or provide food for deer in the city on any public or private property. This prohibition includes, but is not limited to, disbursement of food on the ground, at a feeding station, in a feeding device, or in a container of any form; providing a salt or mineral lick/block; or any other means which serves to provide feed to any deer in the city.

---

3. Title IX, Chapter 91 of the Fort Thomas, Kentucky, Code of Ordinances is entitled "Animals." Section 91.51 is entitled "Feeding Prohibited."

  (B)  A person shall be deemed to have knowingly, purposely or intelligently fed deer, caused deer to be fed, or provided food to deer if the person places, or allows to be placed, wheat, pelleted livestock food, corn in any form, fruit, vegetables, hay or alfalfa, human food scraps, any form of commercially sold wildlife feed, birdseed or livestock feed, or any other edible matter that deer will consume on the ground or within the reach of deer. This prohibition shall not include live vegetation such as ornamental landscaping, flowers, trees, vines, vegetables, gardens, edible matter located either in an enclosed building or stored in a securely sealed package, or unmodified commercially produced bird feeders or their equivalent when placed out of reach of deer.

A violation of this ordinance subjects the violator to a fine of $100 for the first offense, $250 for the second offense, and $500 for each subsequent offense. *See* § 91.99(h). Additionally, persons receiving written notice from the city that they are in violation of § 91.51 are required to permanently remove the feed or feeding device. *See* § 91.52.

Plaintiffs contend that § 91.51 is unconstitutional because prohibiting ground feeders impermissibly infringes upon the Commerce Clause. [Record No. 23, p. 14–17] Additionally, they argue that § 91.51 should be struck down because it is arbitrary and capricious in violation of Section 2 of the Kentucky Constitution and because the ordinance is unconstitutionally vague under both state and federal law.

At the hearing, Ms. Brunjes rejected the assertion that § 91.51 violates any provision of Kentucky law. She testified that K.R.S. § 150 provides certain limitations, but that cities are able to establish more stringent requirements than those required by state law. The Court agrees with Ms. Brunjes' conclusions regarding this issue.

### 2.  § 95.05 – Discharge of Arrows

The City amended Title IX of the Fort Thomas, Kentucky, Code of Ordinances § 95.05 ("§ 95.05") to allow an individual to discharge an arrow from a bow or crossbow within the city limits

if he or she complies with certain enumerated safety requirements.[4] [*Id.*] Section 95.05(a) imposes the following distance restrictions:

> (2) When the individual is discharging an arrow from a point not less than 200 feet from a residence, apartment, or business structure not on the property on which the discharge is occurring, or a street, highway, interstate, railroad, or park, in the direction the arrow is discharged; and
>
> (3) When the individual is discharging an arrow in a manner where no residence, apartment[,] or business structure not on the property which the discharge is occurring, or a street, highway, interstate, railroad, or park is less than 100 feet to both the left and right of the direction of the arrow's trajectory;

At the hearing and in their briefs, the Plaintiffs expressed a number of concerns with § 95.05 including claims that: (1) an arrow can potentially travel greater than 200 feet thereby increasing the possibility of it causing irreparable harm,[5] (2) a dying deer could panic and cause injury to someone as it flees, and (3) permitting hunters to come into the City may increase residents' vulnerability to being victims of other crimes. The following is a summary of concerns expressed during the November 21, 2008, hearing:

William Sheffield,[6] a Plaintiff, testified that he joined this litigation due to concerns that children and other residents might be hit by stray arrows, or that children at various school properties and/or buildings might witness or be hurt by an injured deer. He also expressed concern

---

4. Title IX, Chapter 95 of the Fort Thomas, Kentucky, Code of Ordinances is entitled "Health and Safety; Noise Control." Section 95.05 is entitled "Discharge of Firearms and Other Weapons."

5. In their motion, Plaintiffs asserted that an arrow discharged from a crossbow arrows could potentially travel up to 300 feet. [Record No. 23] Additionally, at the hearing, Plaintiff William Sheffield testified that champion archers have shot arrows over 1,300 yards in competitions. However, in addressing the issues presented, the question is not the distance an arrow *might* travel in competitive events, but the distance it is *likely* to travel under the facts presented.

6. Mr. Sheffield is a retiree with some experience in the Philadelphia Police Department. He testified that he has no experience in controlling deer populations.

that either he or his wife could be struck by a wounded, fleeing deer while they take their morning walks. However, he testified that neither he nor his wife had observed an injured deer at any time during which arrow discharge has been permitted since the adoption of § 95.05 (December 2007 to January 2008 and November 2008). Lastly, Mr. Sheffield expressed concern about allowing unregistered hunters to come into Fort Thomas because they could be "burglars, peeping Toms, or child molesters" disguised as hunters. Mr. Sheffield testified that he raised these concerns during the public hearing held prior to the City's amending § 95.05.

Lisa Kelly,[7] also a plaintiff, testified that she fears her children may be struck by a stray arrow when they play in the woods. Because of this, she does not allow her children to enter areas where arrow discharge could be permitted under § 95.05.[8] Ms. Kelly also expressed concern that her dog might be mistaken for a deer and shot by an arrow. Ms. Kelly also voiced her concerns with the proposed Plan at the public hearing.

Sandy Walkenhorst, a Fort Thomas resident, testified that her property is sufficiently large to be designated as an area where arrows can be discharged under § 95.05. Further, on one occasion a potential hunter approached her husband to ask permission to shoot deer on their property; however, permission was refused. Ms. Walkenhorst testified that she will not permit hunting on their land for a number of reasons including her claim that a family pet had been killed by a hunter in the past (apparently unrelated to deer hunting or arrow discharge), and because she finds a commercial product to be effective to prevent deer from damaging her property.

---

7.  Ms. Kelly is a Fort Thomas resident with two sons (ages 12 and 10).

8.  The City designated which lots could permit arrow discharge under § 95.05(a)(7). However, it is up to the individual land owner to decide whether or not to permit arrow discharge on a designated lot.

Finally, although not raised during the hearing, the Plaintiffs argued in their motion that an additional acreage requirement included in the June 2008 amendment to § 95.05 did little to alleviate the public safety hazard. To comply with the amended ordinance, arrows can only be discharged on a lot, or a series of contiguous lots, owned by the same individual, which is at least three acres in size. § 95.05(a)(7). The Plaintiffs contend that this new requirement does not increase public safety, because it fails to address problems associated with irregularly shape lots. Specifically, the Plaintiffs note that an individual could comply with the acreage requirements but still pose a safety hazard by hunting along a very narrow strip of land attached to a larger plot at least 3 acres in size. [Record No. 23, p. 5]

In addressing the concerns expressed by the Plaintiffs and (later) by Ms. Walkenhorst about stray arrows, Ms. Brunjes testified that, in her opinion, the distance limitations in § 95.05 were "above and beyond" what was required from a safety standpoint. Specifically, she testified that while arrows discharged from a compound bow will typically travel no more than 50 yards and those from a crossbow no more than 100 yards, most deer hunters would not attempt to target a deer at a distance of more than 30 yards from the hunter. Further, Ms. Brunjes testified that requiring discharge of arrows only from tree stands would not reduce the danger to the public in any significant way. Rather, she testified that there is a higher likelihood of injury to a hunter from falling out of a tree stand than injury to a bystander from being struck by a stray arrow.

In regard to the concerns about injured deer, Ms. Brunjes testified that with a good hit an injured deer might travel as much as 400–500 yards, but that a deer could travel a much greater distance after being struck if it was not mortally wounded. No evidence was presented to bolster the concern that an injured deer would cause damage to children and others before dying. Finally,

no evidence was presented to substantiate the claim that the Plan increases the risk that "burglars, peeping Tom's, or child molesters" will disguise themselves as hunters in order to victimize Fort Thomas residents.

## II.     STANDARD OF REVIEW

A preliminary injunction is an extraordinary equitable measure. It has been characterized as "one of the most drastic tools in the arsenal of judicial remedies." *ACLU v. McCreary County, Kentucky*, 354 F.3d 438, 444 (6th Cir. 2003) (citation omitted). For this reason it should not be extended to cases which are doubtful or do not come within well-established principles of law. *Id.* (citation omitted). The Sixth Circuit has identified the following factors to be considered in evaluating a motion for injunctive relief: (1) the likelihood of success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction.[9] *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). None of these are prerequisites that must be met, but rather are interconnected factors that the court must balance in order to determine if a preliminary injunction should be granted. *See Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003).

In addition, "[a] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration*, 511 F.3d at 542 (citation omitted). While a party is not required to prove its case in full

---

9.      The Plaintiffs cite three balancing factors under Kentucky law. [Record No. 23, p. 8] However, federal procedural law controls when analyzing a motion for preliminary injunction in federal court. *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98, 102 (6th Cir. 1991).

to obtain injunctive relief, the proof needed "is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

### III.   ANALYSIS

#### A.   Likelihood of Success on the Merits[10]

A plaintiff is not required to prove his or her case in full at a preliminary injunction hearing. However, to establish success on the merits of a claim, a plaintiff must show more than a mere possibility of success. *Certified Restoration*, 511 F.3d at 543 (internal quotations and citations omitted). "It is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as make them fair ground for litigation and thus for more deliberative investigation." *Id.* (citation omitted).

The Plaintiffs ask the Court in invalidate §§ 91.51 and 95.05 for the following reasons: (1) § 95.05 is preempted by state law; (2) § 91.51 unconstitutionally infringes upon the Commerce Clause; (3) both §§ 91.51 and 95.05 are arbitrary and capricious in violation of § 2 of the Kentucky Constitution; and (4) both §§ 91.51 and 95.05 are unconstitutionally vague under the United States and Kentucky constitutions.

#### (1)   Preemption Claim

Plaintiffs claim that § 95.05 regulates deer hunting and is preempted by a comprehensive scheme of legislation already regulating hunting. *See* K.R.S. § 150.050 *et seq.* [Record No. 23, 12]

---

10.   The Court's preliminary findings regarding the likelihood of success of Plaintiffs claims are not binding. *See Univ. Of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("findings of fact and conclusions of law made by a court granting preliminary injunctions are not binding at trial on the merits," and that "it is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits"); *Cyberspace Communs., Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (noting that final conclusions on the ultimate issues involved in the lawsuit are premature and inappropriate at the preliminary injunction stage of proceedings).

To succeed on this claim, the Plaintiffs must demonstrate that the Defendants lacked the authority to enact § 95.05. Through its "Home Rule" statute, the Kentucky General Assembly granted the Defendants authorization to enact ordinances to govern Fort Thomas' public affairs as long as the ordinances do not conflict with state statutory or constitutional law. *See Schilling v. Schoenle*, 782 S.W.2d 630 (Ky. 1990). Specifically, Kentucky's "Home Rule" statute, provides in relevant part, that:

> (1) A city may exercise any power and perform any function within its boundaries . . . that is in furtherance of a public purpose of the city and not in conflict with a constitutional provision or statute.
>
> (2) A power or function is in conflict with a statute if it is expressly prohibited by a statute or there is a comprehensive scheme of legislation in the same general subject embodied in the Kentucky Revised Statutes . . . .

K.R.S. § 82.08.

The Plaintiffs do not dispute that § 95.05 was enacted in furtherance of a public purpose. Likewise, they do not argue that there is a state statute expressly prohibiting the Defendants' enactment of § 95.05. Hence, § 95.05 would only be in conflict with a state statute (and therefore be preempted) if it regulated an area already regulated by a comprehensive scheme of state legislation *See Ky. Licensed Beverage Ass'n. v. Louisville-Jefferson County Metro Gov't.*, 127 S.W.3d 647 (Ky. 2004) (holding that the legislature already adopted a comprehensive scheme of legislation regulating the manufacturing, sale and distribution of alcoholic beverages, and therefore, a local ordinance seeking to regulate in this area was preempted). As a result, to determine if § 95.05 is preempted by state law, the Court must first examine the areas covered by § 95.05.

The precise nature of what § 95.05 regulates is disputed. The Plaintiffs assert that, "[i]t cannot be disputed that the goal of [§ 95.05] was to allow deer hunting." [Record No. 23, p. 4]

However, Defendants claim that § 95.05 does not address any aspects of hunting. Instead, it regulates the conditions under which a person may lawfully discharge an arrow from a bow or crossbow within the city limits. [Record No. 27, p. 6] Under Kentucky law, the essence of statutory construction[11] is to ascertain and give effect to the intent of the [city leaders]." *Peter Garrett Gunsmith, Inc. v. City of Dayton*, 98 S.W.3d 517, 520 (Ky. App. 2002) (citation omitted). To ascertain intent, "courts should view the [ordinance] as a whole, considering not only its language but also its spirit. *Id.* (citation omitted). However, the ordinance's language "bears the greatest importance, and [an ordinance] may not be interpreted in a manner that conflicts with the stated language." *Id.* (citation omitted). "Accordingly a court may not insert language to arrive at a meaning different from that created by the stated language in the [ordinance]." *Id.* (citation omitted).

Neither party disputes that § 95.05 was enacted as part of a comprehensive deer management plan. The Court agrees with the Defendants that, based on the ordinance's language, § 95.05 regulates the discharge of arrows and not hunting *per se*. This point is further underscored by the "Archery in Fort Thomas" informational brochure distributed by the Defendants to explain § 95.05. [Record No. 23, Ex. 10] Section one of the pamphlet clearly states that:

> The discharge ordinance adopted by council is NOT a deer hunting ordinance. The Kentucky Department of Fish and Wildlife is responsible for regulating hunting in the Commonwealth of Kentucky. Kentucky cities are not permitted by state law to regulate hunting. The ordinance adopted by the City of Fort Thomas instead regulates the discharge of arrows from bows and crossbows.

[*Id.*] (emphasis original)

---

11. While these rules of statutory construction apply in construing state statutes they are also applicable in construing a municipal ordinance.

There is some support for the Plaintiffs' assertion that § 95.05 is nothing more than a thinly-veiled hunting regulation. Notably, the Defendants admit in their motion for summary judgment that the reason for enacting the ordinance was to change the law to allow bow-hunting *as a means of* controlling the deer population. [Record No. 22, p. 4] However, this purpose is not reflected in the ordinance language. In addition, both parties used the terms "hunter, hunt, and hunting" in the hearing.[12] However, the use of these words does not establish that § 95.05 is actually a hunting ordinance.

Facially, § 95.05 regulates the discharge of arrows at any target within the Fort Thomas city limits, which could include, but is not limited to, deer. The Court is not inclined to give additional meaning to the ordinance regarding what it regulates when the statutory language is unambiguous. *See Peter Garrett Gunsmith*, 98 S.W.3d at 520. Since § 95.05 does not regulate hunting, there is no need to determine whether this ordinance would be preempted by the state statutory scheme regulating hunting. Having reviewed the parties' arguments regarding this factor, it unlikely that the Plaintiffs will succeed on the merits of this claim.

### (2) Commerce Clause Violation Claim

The Plaintiffs also contend that § 91.51 violates the Commerce Clause. [Record No. 22, p. 14–17] To succeed on this claim, the Plaintiffs must demonstrate that § 91.51 places an unreasonable burden on interstate commerce. The Commerce Clause explicitly grants Congress the authority to regulate commerce among the States, and implicitly restricts states' and local governments' ability to regulate interstate commerce. U.S. CONST., art. I, § 8, cl.3; *Huish Detergents, Inc. v. Warren*

---

12. During the hearing, Police Chief Michael Daley declined to use a term other than "cull."

*County, Ky.*, 214 F.3d 707, 712 (6th Cir. 2000). This implied restriction on state and local governments is referred to as the dormant Commerce Clause.[13] *Id.*

Here, there is no evidence that § 91.51discriminates against interstate commerce by treating in-state and out-of-state interests differently. As a result, the ordinance will be upheld unless the burden it imposes on interstate commerce is "clearly excessive in relation to the putative local benefits." *Dep't of Revenue v. Davis*, 128 S. Ct. 1801, 1808 (2008).

Plaintiffs argue that since § 91.51 prohibits the use of ground and bird feeders accessible to deer, "[t]he City has dramatically decreased the market for ground feeders in the Northern Kentucky Region." [Record No. 23, p. 16] Since ground feeders are "undoubtedly manufactured in other states and transported through other states," the Plaintiffs contend that § 91.51 burdens interstate commerce. [*Id.*] The Plaintiffs also argue that since no baseline population surveys were conduct, and because there is no mandatory requirement to report deer kills, the Defendants have no way of measuring the Plan's benefits. Based on this reasoning, the Plaintiffs conclude that "[t]his burden when weighed against a benefit the City has chosen not to measure tips the scales of consideration in favor of the Plaintiffs." [*Id.*]

The Court finds it highly unlikely that the Plaintiffs would succeed on this claim. The Plaintiffs speculate that § 91.51 burdens interstate commerce by drastically reducing demand for ground feeders produced outside the Commonwealth, yet offer no evidence to support this assertion. A non- discriminatory ordinance only violates the dormant Commerce Clause if the burden it places on interstate commerce is *clearly excessive* in relation to the putative local benefits. *See Davis*, 128

---

13. *See Huish Detergents*, 214 F.3d at 712 (noting that there is no "Dormant Commerce Clause," but that courts have consistently use this inaccurate term).

S. Ct. at 1808. Even assuming the Defendants are unable to quantify the benefits of § 91.51, this Court finds it unlikely that the incidental burden the ordinance places on interstate commerce is "clearly excessive."

### (3)   Arbitrary and Capricious Claims

The Plaintiffs also contend that §§ 91.51 and 95.05 are arbitrary and capricious and, therefore, violate Section 2 of the Kentucky Constitution. [Record No. 23, pp. 17–19] To succeed on this claim, the Plaintiffs must demonstrate that the enforcement of these ordinances is an arbitrary and capricious wielding of power over the lives, liberty, or property of Kentuckians. *See* KY. CONST. § 2. Analysis begins with the presumption of constitutionality. *See Elk Horn Coal Corp. v. Cheyenne Resources, Inc.*, 163 S.W.3d 408 (Ky. 2005).

Section 2 of the Kentucky Constitution is generally understood to be a due process provision which enjoins the state against arbitrariness and ensures fundamentally fair and unbiased procedures. *Commonwealth Natural Res. & Envtl. Prot. Cabinet v. Kentec Coal Co., Inc.*, 177 S.W.3d 718, 724 (Ky. 2005) (citations omitted). When fundament rights are not a stake, substantive due process under KY. CONST. § 2 only requires "that a statute be rationally related to a legitimate state objective." *Stephens v. State Farm Mut. Auto Ins. Co.*, 894 S.W.2d 624, 627 (Ky. 1995).

Both ordinances were enacted as part of a three-pronged plan to reduce the urban deer population for the purpose of protecting public safety. [Record No. 22, pp. 1–4] "It has long been recognized that a municipal corporation, pursuant to its police powers, has wide latitude to adopt ordinances which promote the health, safety, morals, and general welfare of the people." *Lexington Fayette County Food & Bev. Ass'n v. Lexington-Fayette Urban County Gov't*, 131 S.W.3d 745, 749 (Ky. 2004). Here, both ordinances are rationally related to Fort Thomas's legitimate public safety

interest. By enacting § 95.05, the Defendants changed the existing ordinance so that a person complying with state hunting laws could legally use a bow or crossbow to assist in reducing the deer population. Similarly by enacting § 91.51, the Defendants sought to reduce the deer population within the city limits by decreasing their available food sources. Thus, this Court finds that both §§ 91.51 and 95.05 are rationally related to a legitimate government objective and are not unconstitutional under KY. CONST. § 2.

The fact that deer population surveys were not conducted does not render the ordinances arbitrary and capricious. [Record No. 23, pp. 17–19] The Sixth Circuit has held that a study regarding the problem an ordinance seeks to address is not a requirement for a municipality to enact an ordinance directed toward social welfare regulation adopted in exercise of its police power. *See Kutrom Corp. v. Center Line*, 979 F.2d 1171, 1174–75 (6th Cir. 1992). Accordingly, it is unlikely that the Plaintiffs will succeed on the merits of this claim.

### (3)    Void-for-Vagueness Claims

The Plaintiffs also contend that § 91.51 and § 95.05(a)(2) and (3) are impermissibly vague and violate the United States and Kentucky constitutions. [Record Nos. 2, p. 4; 23, p. 19–21] Under Kentucky law, a statute is impermissibly vague when a person of common intelligence must guess at the statute's meaning. *Wood v. Commonwealth*, 178 S.W.3d 500, 507 (Ky. 2005) (*citing Broadrick v. Oklahoma*, 413 U.S. 601 (1973)). Therefore, Kentucky's "void-for-vagueness doctrine" requires that an enactment provide: (1) "'fair notice' to persons and entities subject to it regarding what conduct it prohibits; and (2) sufficient standards to those charged with enforcing it so as to avoid arbitrary and discriminatory application." *Id.* at 508 (citation omitted). However, "the fact that a statute is susceptible to more than one interpretation, does not require a holding that the

statute is unconstitutional if those who are affected by the statute can reasonably understand what the statute requires of them." *Id.* (citation omitted).

Section 91.51(a) states that "[n]o person shall knowingly, purposely or intentionally feed deer . . . ." Section 91.51(b) adds that "[a] person shall be deemed to have knowingly, purposely or intentionally fed deer . . . if the person places, or allows to be placed ,. . . [list of edible matter that deer will consumer] on the ground or within reach of the deer." The Plaintiffs contend that this ordinance establishes two different requisite intent levels — the "mens rea requirement sinks from being knowing and purposeful in the first paragraph to [a] level near negligence in the second paragraph." [Record No. 23, p. 20] The Plaintiffs argue that these dual intent levels will leave a person of ordinary intelligence guessing at whether it is a violation to place food on the ground, or whether it is a violation to fail to pick-up birdseed spilled from a feeder. [*Id.*, p. 20–21]

The undersigned disagrees with the Plaintiffs' contention that the language in paragraph (b) lowers the intent level to "near negligence." Reading the two paragraphs together, this Court interprets § 91.51 as prohibiting a person from knowingly, purposely, or intelligently *placing* food out for deer, or knowingly, purposely, or intelligently *allowing another to place* food out for deer. In short, a person of ordinary intelligence has adequate notice regarding what the ordinance prohibits. Consequently, § 91.51 is sufficiently clear and does not violate the Kentucky Constitution.

The Plaintiffs' also argue that "§ 95.05(a)(2) and (3) as written simply make no sense and are void on their face for being unintelligible." [Record No. 2, p. 4] These sections provide that:

> (A)   Exceptions: The provisions of this section shall not apply to any individual discharging an arrow from a bow or crossbow when such discharge meets all of the following requirements:

(2) When the individual is discharging an arrow from a point not less than 200 feet from a residence, apartment, or business structure not on the property on which the discharge is occurring, or a street, highway, interstate, railroad, or park, in the direction the arrow is discharged; and

(3) When the individual is discharging an arrow in a manner where no residence, apartment[,] or business structure not on the property which the discharge is occurring, or a street, highway, interstate, railroad, or park is less than 100 feet to both the left and right of the direction of the arrow's trajectory;

Contrary to the Plaintiffs' assertion, the Court finds these safety requirements to be clear and believes that a person of ordinary intelligence would not need to guess at the their meaning when reading these requirements in context with the other safety requirements set out in § 95.05(a). Plaintiffs provide no evidence nor any additional argument regarding why these requirements are unconstitutionally vague. Consequently, the Court concludes that § 95.05(a)(2) and (3) are sufficiently clear and do not violate the Kentucky Constitution.

Under federal law, the Due Process Clause of the Fifth and Fourteenth Amendments provide the constitutional foundation for the void-for-vagueness doctrine. *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999). An ordinance is impermissibly vague if it (1) fails to define the offense with sufficient definiteness that ordinary people can understand prohibited conduct, or (2) fails to establish standards to permit police the law in an non-arbitrary, non-discriminatory manner. *Id.* This test is virtually identical to the test under Kentucky law. Based on the same analysis discussed above, the Court concludes that §§ 91.51 and 95.05(a)(2) and (3) are sufficiently clear and do not violate the United States Constitution.

In summary, the undersigned finds that the Plaintiffs have not shown a likelihood of succeeding on the merits of any of their claims.

### B. Irreparable Injury

As discussed previously, the Plaintiffs express fear they could be personally injured by an errant arrow or a wounded deer.[14] However, neither Plaintiff has been injured in any of the past periods where arrow discharge was permitted under § 95.05. In fact, neither Plaintiff testified that he or she has actually observed a person discharging an arrow in part of the City. Additionally, no evidence was presented that anyone in Fort Thomas has ever been injured by a stray arrow or a wounded deer. Mere speculation of how an injury might possibly occur is unpersuasive, particularly in light of Ms. Brunjes testimony regarding her belief that § 95.05's standards and limitations are "above and beyond" what is required from a safety standpoint. In summary, the Court concludes that the Plaintiffs have failed to show that their assertion of irreparable injury has any merit.

### C. Likelihood of Harm to Others

Granting a preliminary injunction would, however, increase the likelihood of harm to others. The Plan was enacted in response to a legitimate concern regarding increasing deer/vehicle accidents, increased property damage caused by deer, and potential health concerns. Unlike the speculative harm discussed above, there is evidence that deer interactions with people and property due to increasing deer populations has been harmful to Fort Thomas residents. The Plan's goal is to lower the risk of this harm by decreasing the deer population within city limits. The Plan is rationally related to achieving a legitimate objective. While the Defendants did not present evidence that deer in the area were carriers of Lyme disease or that they were subject to Chronic

---

14. This is not a class action. Therefore, under this prong of the analysis for injunctive relief, the Plaintiffs must demonstrate irreparable injury to one or more Plaintiffs or their properties. While the Court may consider possible or harm or injuries to others, the analysis does not fall under this part of the analysis.

Wasting Disease, this does not mean that the ordinance is arbitrary. The City's response to property damage and to increasing numbers of deer/vehicle accidents is sufficient to establish a legitimate purpose.

Based on Ms. Brunjes testimony and other materials submitted in connection with the Plaintiffs' motion for injunctive relief and the Defendants' response to that motion, the Court is convinced that a deer problem does exist in Fort Thomas, and that preventing the City from enforcing the Plan would only exacerbate the problem associated with the increasing deer population. Accordingly, there is a high likelihood that granting the preliminary injunction would increase the risk of harm to others. In comparison, in light of the safety provisions contained in the ordinance, the Court believes that the potential risk of harm to the public from stray arrows or injured deer is quite low.

### D. The Public Interest

Fort Thomas enacted these ordinances for public safety purposes – *i.e.*, to protect the public from damage and dangers associated with an ever-increasing deer population. As previously discussed, any *potential* harm caused by the Plan is speculative. However, if a preliminary injunction were issued, the legitimate public safety interest of reducing the urban deer population will be hampered. Therefore, granting the relief requested by the Plaintiffs is not in the public's best interest.

### IV. CONCLUSION

After balancing the factors outlined above, the Court concludes that the Plaintiffs have failed to demonstrate a likelihood that they will suffer irreparable injury if injunctive relief is denied. Further, they have shown very little likelihood of success on the merits of the claims

contained in their complaint. Next, when the Court balances the potential harm to others, that balance favors the denial of injunctive relief. And finally, the public interest will be served if injunctive relief is denied. In summary, evaluation of all relevant factors favors the position taken by the Defendants. Accordingly, it is hereby

**ORDERED** that the Plaintiffs' motion for a preliminary injunction [Record No. 23] should be **DENIED**. The oral findings and conclusions made at the conclusion of the hearing held on November 21, 2008, are also incorporated herein by reference.

This 24th day of November, 2008.

Signed By:
*Danny C. Reeves* DCR
United States District Judge