UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| LISA KELLY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2: 08-54-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| CITY OF FORT THOMAS, KENTUCKY, | ) | **MEMORANDUM OPINION** |
| et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the Defendants' motion for summary judgment.[1]   [Record No. 22]   For the reasons discussed below, the Court will grant the Defendants' motion with respect to all issues with the exception of the issue of whether Ordinance § 91.51 is preempted by state law.

## I.      Procedural History

The Plaintiffs' original Complaint was filed in the Campbell County Circuit Court on January 4, 2008. On March 24, 2008, the matter was removed to this Court. [Record No. 1] Pursuant to this Court's July 30, 2008, Memorandum Opinion and Order, the § 1983 claims asserted against Defendants Mary Brown, Barbara Runge, James Doepker, Roger Peterman,

---

[1]      The Amended Complaint [Record No. 2] named the following Defendants: the City of Fort Thomas, Kentucky, Mayor Mary Brown in her individual and official capacity, and city council members Barbara Runge, James Doepker, Roger Peterman, Barbara Thompson-Levine, Tom Lampe, Eric Haas all in their individual and official capacities.

-1-

Barbara Thompson-Levine, Tom Lampe, and Eric Haas in their individual capacities were dismissed. However, the Defendants' motions to dismiss were denied with respect to the state law claims asserted against them in their individual capacities. [Record No. 20] In addition, on November 21, 2008, a preliminary injunction hearing was held; however, the relief requested by the Plaintiffs was subsequently denied. [Record No. 37]

## II.     Background

It has been estimated that, in the 1950s, there were approximately 2,000 deer in Kentucky, most of which were concentrated in the Land Between the Lakes region in the western part of the state. During the 1960s, the Kentucky Department of Fish and Wildlife Resources ("KDFWR") began to re-stock deer throughout the commonwealth. Since then, the population has exploded with approximately 450,000 deer estimated to be located throughout Kentucky by 1998. And it has been estimated that by 2004, the state's deer population doubled to approximately 900,000.

Northern Kentucky, including Campbell County where the city of Fort Thomas ("City") is located, is one of the more densely populated areas of the state. [Record No. 22, p. 1] Problems related to the every-expanding Kentucky deer population in the City have become apparent as evidenced by increasing motor vehicle/deer accidents, deer carcasses with signs of physical trauma found along roadways, and complaints of deer damaging citizens' property.

By October 2006, the Fort Thomas City Council ("City Council") concluded that it needed to better manage its deer population, and tasked City Administrative Officer Donald Martin ("Martin") with the responsibility of identifying alternatives plans to accomplish this

objective.  During the following year, Martin worked closely with KDFWR representatives including Clay Smitson, Regional Enforcement Officer for Nuisance Animals, Dr. Tina Brunjes ("Brunjes"), Kentucky Big Game Program Coordinator, and Jim Lane,  Kentucky Wildlife Division Director, in an effort to develop a deer management plan.  Martin then presented several possible options to the City Council's Public Safety Committee.  These options included: (1) planting deer-resistant plants; (2) installing fences; (3) installing scare devices; (4)  using deer repellent spray; (5) educating the public about the need to stop feeding deer in the City; (6) urban hunting either with guns or bows; (7) using U.S.D.A. sharpshooters to eliminate a portion of the deer population in the area; (8) relocation; (9) contraception; (10) sterilization; (11) contragestation; and (12) introduction of coyotes.

Based, in part, on advice from KDFWR representatives, the City Council rejected most of the options as being ineffective, too expense, and/or possibly counterproductive.  [*Id.*, p. 4, Ex. I, p. 2–4] Finally, the City Council adopted a three-pronged deer management plan ("Plan") that involved: (1) public education about safe driving during deer season and how private property owners could prevent deer from damaging landscape areas;[2] (2) a prohibition on deer feeding; and (3) the active removal of deer from city limits.  The second and third prongs of the Plan were implemented through a series of ordinances.  [*Id.*, p. 4]

On December 3, 2007, the City Council adopted the following ordinances related to the prohibition of intentional deer feeding: § 91.50 (outlining the City Council's determination that

---

[2]      The public education portion of the Plan is contained on the City's website. Along with tips for avoiding deer collisions, attacks, and diseases, the website also provides several  deer management strategies for homeowners including purchasing deer resistant plants or repelling sprays, using other deterring scents, and installing fences, netting, and scare devices.  *See* www.ftthomas.org/Deer.html.

the City's urban deer posed a threat to its citizens), § 91.51 (prohibiting deer feeding), § 91.52 (requiring the removal of feed or feeding devices that are accessible to deer), and § 91.99(h) (establishing a civil fine for violations of §§ 91.51 or 91.52). In addition, the City Council decided to follow the KDFWR's recommendation that it allow the use of bows to effectuate the third prong of the Plan. To accomplish this, the City Council amended § 95.05 (permitting the discharge of arrows within City limits if specific safety requirements are met), and adopted §§ 95.30, 95.31, and 95.32 (collectively outlining the requirements for field dressing any animal killed in conjunction with § 95.05). [*Id.*, p. 4–7]

Plaintiffs Lisa Kelly and William Sheffield, both Fort Thomas residents, raise forty-five allegations in their Amended Complaint relating to the Plan Ordinances.[3] These allegations can be grouped into the follow categories: (1) all Plan Ordinances are arbitrary and capricious and violate the United States and Kentucky constitutions; (2) all Plan Ordinances are void for vagueness under the United States and Kentucky constitutions; (3) each Plan Ordinance constitutes special legislation; (4) § 91.51 and § 95.05 are preempted by state law; (5) § 91.51 and § 91.52 unconstitutionally infringe upon the Commerce Clause; and (6) § 91.51(b) "creates a criminal presumption not authorized by the legislature," and the associated fine under § 91.99 "is a penalty not authorized by the Kentucky Criminal Code." [Record No. 2, pp. 3–9]

The Defendants contend that they are entitled to summary judgment on all claims asserted in the Plaintiffs' Amended Complaint. [Record No. 22, p. 8] The Plaintiffs, however, argue

---

[3]     The term "Plan Ordinances" is used when referring to all the ordinances that collectively implement the plan.

that  summary judgment is inappropriate due to several unresolved issues.  [Record No. 29, p.
10]

### III.    Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a
matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Barr
v. Lafon*, 538 F.3d 554, 561 (6th Cir. 2008).  In contrast, "summary judgment is inappropriate
when the evidence raises a genuine issue of material fact." *Barr*, 538 F.3d at 561.  A dispute
over a material fact is not "genuine" unless a reasonable jury could return a verdict for the
nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the burden to show that no genuine issue of material
fact exists, "but that burden may be discharged by showing – that is, pointing out to the district
court – that there is an absence of evidence to support the nonmoving party's case." *CenTra,
Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) (*citing Celotex*, 477 U.S. at 325).  Once the
moving party has met its burden of production, the nonmoving party "must do more than simply
show that there is some metaphysical doubt as to the material facts." *Sigler v. American Honda
Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.,* 475 U.S. 574, 586 (1986)).  The nonmoving party cannot rely upon the assertions in its

pleadings, and therefore must come forward with probative evidence such as sworn affidavits, to support its claims.[4]  *Celotex*, 477 U.S. at 324.

In reviewing a party's motion for summary judgment, a court's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Barr*, 538 F.3d at 561 (*quoting Anderson*, 477 U.S. at 249).  In doing so, all evidence must be viewed in the light most favorable to the nonmoving party.  *Id.*  However, a mere scintilla of evidence is insufficient defeat a motion for summary judgment.  *In re Petty*, 538 F.3d 431, 439 (6th Cir. 2008).  Rather, there must be evidence on which the jury could reasonably find for the nonmoving party.  *Id.*

Ultimately, the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52; *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

## IV.    Analysis

### A.    Allegations That The Plan Ordinances Are Arbitrary & Capricious

In their Amended Complaint, the Plaintiffs allege that the Plan Ordinances are arbitrary and capricious and, therefore, unconstitutional under § 2 of the Kentucky Constitution and unspecified sections (presumably the Fourteenth Amendment) of the United States Constitution.

---

[4]    On two occasions, the Plaintiffs assert that the Defendants have not presented any sworn testimony or affidavits in support of their motion for summary judgment.  [Record No. 29, p. 11; No. 46, p. 7] With respect to this argument, the Court notes that while the moving party has the burden of production, FED. R. CIV. P. 56 does not expressly or impliedly *require* the moving party to support its motion with affidavits or other materials negating the opponent's claim.  *Celotex*, 477 U.S. at 323.

[Record No. 2, pp. 4–7]  The gravamen of this issue concerns which standard of review should be applied.  The Plaintiffs argue that strict scrutiny review should be applied because the Plan Ordinances threaten a fundamental right – the right to be free from risk of serious bodily injury.[5]  [Record No. 29, p. 16]  If strict scrutiny review is applied, the Plan Ordinances could be upheld only if they are narrowly tailored to a compelling governmental interest.  *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007); *Weiand v. Bd. of Trustees of Ky. Retirement Sys.*, 25 S.W.3d 88, 92 (Ky. 2000).  In contrast, the Defendants argue that rational basis review is appropriate because there are no fundamental rights at stake.  [Record No. 22, p. 17]  If rational basis review is applied, the Plan Ordinances would be upheld as long as they were rationally related to legitimate government objectives.  *Munoz*, 507 F.3d at 966; *Stephens v. State Farm Mut. Auto Ins. Co.*, 894 S.W.2d 624, 627 (Ky. 1995).  As these standards are the same under both Kentucky and federal law, a single analysis for both will suffice.

The key to applying the appropriate standard of review is determining whether the Plan Ordinances unjustly intrude upon a fundamental right.  The Supreme Court has long recognized that a person has a fundamental right to be free from "unjustified intrusions on personal security."  *Ingraham v. Wright*, 430 U.S. 651, 673 (1977).  The Plaintiffs argue that the Plan Ordinances violate this fundamental right because they constitute government actions that threaten the Plaintiffs' personal security.  In support, they rely upon the Sixth Circuit's holding in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998).   [Record No. 29, pp. 16–19; No. 46, p. 6]   However, *Kallstrom* is distinguishable.

---

[5]        While the Plaintiffs include all the Plan Ordinances in this argument, only one ordinance (§ 95.05) can reasonably be construed as possibly increasing the Plaintiffs' potential risk of bodily harm.

In *Kallstrom*, three undercover police officers sued the City of Columbus, Ohio under § 1983 after the city made their personal information discoverable to defense attorneys who then passed it on to defendant gang members. *Kallstrom*, 136 F.3d at 1060. The case involved liability under the "state-created-danger theory," which is "predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence. *Id.* at 1066. However, the *Kallstrom* court specifically noted that this theory requires a showing of "special danger," and that the "state must have known or clearly should have known that its actions specifically endanger an *individual*." *Id.* (emphasis added). The court explained that the reason for this "special danger" requirement is

> because many state activities have the potential to increase an individual's risk of harm, we require plaintiffs alleging a constitutional tort under § 1983 to show "special danger" in the absence of a special relationship between the state and either the victim or the private tortfeasor. *The victim faces "special danger" where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large.*

*Id.* (emphasis added).

The present case is materially distinguishable from *Kallstrom*. At issue here are generally applicable ordinances, not government actions increasing the risk of harm specifically to the Plaintiffs. Even assuming, *arguendo*, that the Plan Ordinances may increase the risk that a Plaintiff will be exposed to private acts of violence,[6] the Plaintiffs could not prevail under the state-created-danger theory because there is no evidence that the Plan Ordinances subject the Plaintiffs to any "special danger." Thus, the state-created-danger theory of liability discussed

---

[6]     The Court is not convinced that being struck by an errant arrow or a wounded deer would constitute a "private act of violence." It is more likely that such an event would be considered either an accident or a negligent act.

in *Kallstrom* is inapplicable.  In addition, the holding in *Kallstrom* was specifically limited in that the court indicated that "we do not mean to imply that every governmental act which intrudes upon an individual's body invokes the Fourteenth Amendment." *Id.* at 1064.

The Court rejects the Plaintiffs' contention that a genuine issue exists regarding whether the degree of intrusion in the instant case rises to the level where strict scrutiny review should be applied as was done in *Kallstrom*.  [Record No. 46, p. 6]  The holding in *Kallstrom* should not be applied to this case, and therefore, the determination of whether the degree of intrusion rises to a level discussed in *Kallstrom* is irrelevant.  And other than *Kallstrom*, the Plaintiffs fail to cite any authority in support of their argument that the Plan Ordinances violate a fundamental right.  The Plaintiffs also fail to offer any evidence that they have been, or are likely to be, physically harmed because of the Plan Ordinances.  The Plaintiffs' responsive pleadings and testimony during the preliminary injunction hearing[7] provide only conjecture regarding their fear about the possibility of harm, a fear which Dr. Brunjes testified was unfounded.[8]

---

[7]      William Sheffield testified that he joined this litigation due to concerns that children and other residents might be hit by stray arrows, or that children at various school properties and/or buildings might witness or be hurt by an injured deer.  He also expressed concern that either he or his wife could be struck by a wounded, fleeing deer while they take their morning walks.  However, he testified that neither he nor his wife had observed an injured deer at any time during which arrow discharge has been permitted since the amendment of § 95.05 (December 2007 to January 2008 and November 2008).  Lastly, Mr. Sheffield expressed concern about allowing unregistered hunters to come into Fort Thomas because they could be "burglars, peeping Toms, or child molesters" disguised as hunters.

Lisa Kelly testified that she fears her children may be struck by a stray arrow when they play in the woods.  Because of this, she does not allow her children to enter areas where arrow discharge could be permitted under § 95.05.  Ms. Kelly also expressed concern that her dog might be mistaken for a deer and shot by an arrow.

[8]      Dr. Brunjes testified that, in her opinion, the distance limitations in § 95.05 were "above and beyond" what was required from a safety standpoint.  Specifically, she testified that while arrows discharged from a compound bow will typically travel no more than 50 yards and those from a crossbow no more than 100 yards, most deer hunters would not attempt to target a deer at a distance of more than 30 yards from the

In summary, there is no evidence that the Plan Ordinances actually pose an increased risk of bodily harm to the Plaintiffs that would rise to a level of being an unjust intrusion on their personal security. Thus, the Court rejects the Plaintiffs' argument that the City's actions threaten a fundamental right.

When fundament rights are not a stake, substantive due process under both the United States and Kentucky constitutions requires that a statute be rationally related to a legitimate government interest. *Munoz*, 507 F.3d at 966; *Stephens*, 894 S.W.2d at 627. The Plan Ordinances enabled the City to enact its three-pronged plan to reduce the urban deer population for the purpose of protecting public safety. [Record No. 22, pp. 1–4] "It has long been recognized that a municipal corporation, pursuant to its police powers, has wide latitude to adopt ordinances which promote the health, safety, morals, and general welfare of the people." *Lexington Fayette County Food & Bev. Ass'n v. Lexington-Fayette Urban County Gov't*, 131 S.W.3d 745, 749 (Ky. 2004). And under the undisputed facts of this case, the Court concludes that the Plan Ordinances are rationally related to the City's public safety interest in reducing its urban deer population. By enacting § 91.50, *et seq.* the Defendants sought to reduce the deer population by decreasing their available food sources within the city limits. Similarly, amended § 95.05 permits a person who complies with the accompanying restrictions to use a bow or

---

hunter. Further, Ms. Brunjes testified that requiring discharge of arrows only from tree stands would not reduce the danger to the public in any significant way. Rather, she testified that there is a higher likelihood of injury to a hunter from falling out of a tree stand than injury to a bystander from being struck by a stray arrow.

In regard to the concerns about injured deer, Ms. Brunjes testified that with a good hit an injured deer might travel as much as 400–500 yards, but that a deer could travel a much greater distance after being struck if it was not mortally wounded.

crossbow to assist in culling the deer population.  Finally, the field dressing requirements in the § 95.30–95.32 are rationally related to the City's public health concerns arising from a likely increase in deer kills within city limits.

The Plaintiffs still contend that a genuine issue of material fact exists even under rational basis review, because the City has not conducted any population surveys, or other statistical analysis from which to judge the Plan's success.  [Record No. 29, p. 18]  However, the Sixth Circuit has held that a study regarding the problem an ordinance seeks to address is not a requirement for a municipality to enact an ordinance directed toward social welfare regulation adopted in exercise of its police power.  *See Kutrom Corp. v. Center Line*, 979 F.2d 1171, 1174–75 (6th Cir. 1992).  Therefore, the fact that the City did not conduct a deer count before enacting the Plan Ordinances does not render them arbitrary or capricious.

In summary, the Court holds that the Plan Ordinances are rationally related to a legitimate government interest, and are neither arbitrary nor capricious under the United States or Kentucky constitutions.  Accordingly, the Court will grant the Defendants' motion for summary judgment as to this issue.

### B.      Allegations That The Plan Ordinances Are Void for Vagueness

The Plaintiffs make two void for vagueness claims in their Amended Complaint.  First, they assert that all the Plan Ordinances are "void for vagueness on their face and as applied."  Second, and more specifically, the Plaintiffs' claim that "§ 95.05(a)(2) and (3) as written simply make no sense and are void on their face for being unintelligible."  [Record No. 2, p. 4]

Under Kentucky law, a statute is impermissibly vague when a person of common intelligence must guess at the statute's meaning. *Wood v. Commonwealth*, 178 S.W.3d 500, 507 (Ky. 2005) (*citing Broadrick v. Oklahoma*, 413 U.S. 601 (1973)). Therefore, Kentucky's "void-for-vagueness doctrine" requires that an enactment provide: (1) "'fair notice' to persons and entities subject to it regarding what conduct it prohibits; and (2) sufficient standards to those charged with enforcing it so as to avoid arbitrary and discriminatory application." *Id.* at 508 (citation omitted). The test for void-for-vagueness is virtually identical under federal law. *See Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999). While an enactment must be sufficiently clear to satisfy these requirements, there is no requirement that it be a model of clarity, nor does it have to be expressed in "mathematically precise" terms to be constitutional. *See Dèjá vu of Cincinnati, LLC v. Union Twp.*, 411 F.3d 777 (6th Cir. 2005). In addition, "the fact that a statute is susceptible to more than one interpretation, does not require a holding that the statute is unconstitutional if those who are affected by the statute can reasonably understand what the statute requires of them." *Wood*, 178 S.W.3d at 508 (citation omitted). As long as the enactment is sufficiently clear to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" then it will not be struck down under the void-for-vagueness doctrine. *Dèjá vu of Cincinnati*, 411 F.3d at 798.

Here, the Plaintiffs' contend that § 91.51 is impermissibly vague because it allegedly creates duel levels of intent in subsections (a) and (b), and, therefore, "a person of average intelligence is left only a guess as to which paragraph of the ordinance will be enforced on any given day." [Record No. 29, pp. 20–21]  The language in question in § 91.51(a) states that "[n]o

-12-

person shall knowingly, purposely or intentionally feed deer . . ."  Section 91.51(b) then adds that "[a] person shall be deemed to have knowingly, purposely or intentionally fed deer . . . if the person places, or allows to be placed . . . [list of edible matter that deer will consumer] on the ground or within reach of the deer."

In support of this claim, the Plaintiffs argue that, "[a]s applied here, the word 'allow,' means 'to forbear or neglect to restrain or prevent.'  Neglecting to prevent an event is a completely different level of intent than 'intentionally, purposely, and knowingly.'" [*Id.*, p. 20] Additionally, in their motion for a preliminary injunction, the Plaintiffs argued that, because of the alleged duel levels of intent, the "mens rea requirement sinks from being knowing and purposeful in the first paragraph to [a] level near negligence in the second paragraph." [Record No. 23, p. 20]

The undersigned disagrees with the Plaintiffs' interpretation of these sections.  Reading the two paragraphs together, the Court interprets § 91.51 as prohibiting a person from knowingly, purposely, or intelligently *placing* food out for deer, or knowingly, purposely, or intelligently *allowing another to place* food out for deer.  In short, a person of ordinary intelligence has adequate notice regarding what the ordinance prohibits.  Consequently, § 91.51 is sufficiently clear and does not violate either United States or Kentucky constitutions.

The Plaintiffs' also argue that "§ 95.05(a)(2) and (3) as written simply make no sense and are void on their face for being unintelligible." [Record No. 2, p. 4]  These sections provide that:

(A)    Exceptions: The provisions of this section shall not apply to any individual discharging an arrow from a bow or crossbow when such discharge meets all of the following requirements:

-13-

(2)     When the individual is discharging an arrow from a point not less than 200 feet from a residence, apartment, or business structure not on the property on which the discharge is occurring, or a street, highway, interstate, railroad, or park, in the direction the arrow is discharged; and

(3)     When the individual is discharging an arrow in a manner where no residence, apartment[,] or business structure not on the property which the discharge is occurring, or a street, highway, interstate, railroad, or park is less than 100 feet to both the left and right of the direction of the arrow's trajectory;

Contrary to the Plaintiffs' assertion, the Court finds these safety requirements to be clear and believes that a person of ordinary intelligence would not need to guess at the their meaning when reading these requirements in context with the other safety requirements set out in § 95.05(a).  Plaintiffs provide no evidence nor any additional argument regarding why these requirements are unconstitutionally vague.  Having reviewed these provisions, the Court concludes that § 95.05(a)(2) and (3) are sufficiently clear and do not violate the United States or Kentucky constitutions.

In summary, there is no evidence to support the Plaintiffs' contention that any of the Plan Ordinances are void for vagueness.  Accordingly, the Court will grant the Defendants' motion for summary judgment regarding this issue.

### C.     Allegations That The Plan Ordinances Constitute Special Legislation

The Plaintiffs allege in their Amended Complaint that the Plan Ordinances are "unconstitutional as special legislation."  [Record No. 2, p. 5]  Since the Plaintiffs failed to specify the constitutional provision on which this allegation is premised, the Defendants presumed that the allegation was based upon § 59 of the Kentucky Constitution.  [Record No.

-14-

22, p.5]  And inasmuch as the Plaintiffs never addressed this issue in their response, the Court will assume the Defendants' presumption is correct.

Section 59 of the Kentucky Constitution delineates the subjects upon which the General Assembly cannot pass special legislation.  Since the Plan Ordinances were enacted by the City Council, *and not* the General Assembly, this prohibition does not affect these ordinances. Accordingly, the Court will grant the Defendants' motion for summary judgment regarding this issue.

### D.      Allegations That State Law Preempts The Plan Ordinances

The Plaintiffs allege that all of the Plan Ordinances are preempted by state law.  [Record No. 2, pp. 4–9; No. 29 p. 12] However, for the reasons discussed below, the Court will grant the Defendants' motion for summary judgment on all preemption issues, except the issue of whether § 91.51 is preempted.

Pursuant to Kentucky's "Home Rule" statute, "[a] city may exercise any power and perform any function within its boundaries . . . that is in furtherance of a public purpose of the city and not in conflict with a constitutional provision or statute."  KRS 82.08(1).  Subsection (2) adds that, "[a] power or function is in conflict with a statute if it is expressly prohibited by a statute or there is a comprehensive scheme of legislation in the same general subject embodied in the Kentucky Revised Statutes."  KRS 82.08(2).  Plaintiffs contend that § 91.51 is preempted, because it directly conflicts with state law.  Additionally, they contend that § 95.05(a)(2) and (3), as well as §§ 95.30–95.32 are preempted, because there is a comprehensive scheme of legislation in the same general subject area embodied in the Kentucky revised statutes.

-15-

### (1)      Section 91.51

The Plaintiffs argue that § 91.51 is preempted, because it prohibits the feeding of deer on private property, an act which they claim is expressly authorized by administrative regulation 301 KAR 2:015, entitled *Recreational Feeding of Wildlife*.[9] Section 2 of this regulation provides that:

> (1)      Unless prohibited by existing administrative regulations, feeding of wildlife is permissible year-round in municipal areas not open to legal hunting or trapping.

> (2)      *Feeding of wildlife can be conducted year-round within the curtilage of the home*.[10]

> (3)      Except as specified in subsection (1) of this section, feeding of wildlife shall not be conducted outside the curtilage of the home from March 1 through July 31.

The Plaintiffs argue that § 91.51 directly contradicts this regulation by prohibiting City residents from feeding deer or placing food within a deer's reach and, therefore, is expressly preempted. [Record No. 29, p. 12–13]

The Defendants contend that the Plaintiffs' reliance on 301 KAR 2:015 is incorrect. They argue that the KDFWR enacted the regulation as a means of managing the public feeding of wildlife and did not intend for it to create an affirmative right to feed wildlife. The Defendants also cite *City of Louisville v. Michael A. Woods, Inc.*, 883 S.W.2d 881 (Ky. App. 1993), in support of their argument that local governments are free to establish more stringent

---

[9]      301 KAR 2:015 is promulgated by the KDFWR under the authority granted by KRS 150.025.

[10]      The regulation adds that "'Curtilage of the home' means the area encompassing the grounds immediately surrounding any home or groups of homes that is used in the daily activity of domestic life, and may or may not be enclosed by a fence or other barrier." 301 KAR 2:015.

requirements than those required by the state.  [Record No. 42, p. 16]   However, the Court is unpersuaded by the holding in *Michael A. Woods, Inc.*  The alleged preemption issue between 301 KAR 2:015 and § 91.51 is express preemption, not preemption by a comprehensive legislative scheme.  Therefore, *Michael A. Woods, Inc.* is distinguishable.

Under Kentucky law, "it is well settled that in the construction of administrative regulations, the same rules apply that would be applicable to statutory construction and interpretation."  *Smithkline Beecham Corp. v. Revenue Cabinet*, 40 S.W.3d 883, 885 (Ky. App. 2001).  Thus, the essence of regulatory construction is to ascertain and give effect to the intent of the [regulatory body].  *See Peter Garrett Gunsmith, Inc. v. City of Dayton*, 98 S.W.3d 517, 520 (Ky. App. 2002) (citation omitted).  To ascertain intent, "courts should view the [regulation] as a whole, considering not only its language but also its spirit.  *Id.* (citation omitted).  However, the regulation's language "bears the greatest importance, and [a regulation] may not be interpreted in a manner that conflicts with the stated language."  *Id.* (citation omitted).  "Accordingly a court may not insert language to arrive at a meaning different from that created by the stated language in the [regulation]."  *Id.* (citation omitted).

In this case, 301 KAR 2:015 unambiguously states that a person can feed wildlife year-round within the curtilage of their home.  However, the stated purposes of the regulation are to enable "law enforcement officers to more effectively enforce 301 KAR 2:140 that prohibits the use of bait for hunting turkeys" and to "significantly lessen risks of disease outbreaks among wildlife as transmission rates are elevated at communal feeding sites."  *See* 301 KAR 2:015 (Regulatory Impact Analysis and Tiering Statement).  Based on these stated purposes, it does

-17-

not appear that the purpose of the regulation was to provide Kentuckians with the affirmative right to feed wildlife within the curtilage of their home. Yet, on its face, the regulation language is clear and unequivocal, thereby creating a direct conflict with § 91.51 which prohibits City residents from feeding deer within the curtilage of their home. Accordingly, the Court will deny summary judgment as to the issue of whether § 91.51 is preempted by state law.

### (2)    Sections 95.05 *et seq.*

Unlike the above analysis which involves alleged preemption by direct conflict, the Plaintiffs' contend that § 95.05 *et seq.*, is preempted because a comprehensive legislative scheme regulating hunting already exists. [Record No. 29, pp. 13–16] The Defendants claim that the ordinances are not preempted, because they do not regulate hunting. [Record No. 22, p. 11]

In addressing this issue, the Court must determine as an initial matter whether § 95.05 *et seq.*, regulates hunting. If this question is answered in the affirmative, then the Court must determine whether legislation regulating hunting in Kentucky is so comprehensive as to preempt additional municipal regulations which are not in direct conflict. However, because the Court answers the first question in the negative, it is not necessary to address the comprehensive nature of hunting regulation in Kentucky.

Section 95.05, entitled *Discharge of Firearms and Other Weapons*, provides that:

> No person shall discharge any firearm of any nature, nor use or discharge any sling, bow or other weapon in the City of Fort Thomas, except as specifically provided hereinbelow. The prohibition of this section shall not apply to any police officer or agent of this city acting in his or her official capacity.

-18-

[Record No. 22, Ex. X, p. 1]   Because this ordinance prohibited a private citizen from discharging arrows, the City Council adopted the following exceptions in order to implement the third-prong of the Plan:

>   (a)   The Provisions of this subchapter shall not apply to any individual discharging an arrow from a bow or crossbow when such discharge meets all of the following requirements
>
>   (1)   When such discharge occurs during the Kentucky archery hunting season for deer as established by the Commonwealth of Kentucky or when such discharge occurs pursuant to a depredation permit issued by the Kentucky Department of Fish and Wildlife Resources; and . . .

[*Id.*]   Subchapters (a)(2)–(6) then provide specific safety requirements, including distance requirements, that must be met in order for a private citizen to lawfully discharge an arrow in compliance with § 95.05.

Sections 95.30–32, which are corollaries to § 95.05, regulate the "field dressing of any animal killed in conjunction with the discharge of any arrow from a bow in strict compliance with § 95.05 of this Chapter."   [Record No. 22, Ex. X, p. 2]   The requirements for field dressing – the process of removing blood and internal organs from an animal carcass – are as follows:

>   Any individual who field dresses an animal within the City of Fort Thomas is required to containerize and remove all blood and internal organs from within the City of Fort Thomas.   No blood or internal organs resulting from field dressing an animal shall be buried, burned, or otherwise disposed of within the City of Fort Thomas, nor shall any blood or internal organs be placed in trash containers for collection by the city or the city's garbage franchisee.

[*Id.*]

The Defendants contend that § 95.05(a)(2) – (3) only describe the conditions under which a person may lawfully discharge an arrow from a bow or crossbow within the city limits, and that

-19-

these subsections do not regulate hunting.  [Record No. 22, p. 11]  This is strongly disputed by the Plaintiffs who respond that the doctrine of pari materia requires that these subchapters be construed in light of the other subchapters in § 95.05 *et seq.*, and that "there can be no doubt [that] Chapter 95 regulates deer hunting."  [Record No. 29, pp. 13–14]

As discussed in the context of regulatory construction in the previous section, the essence of statutory construction[11] is to ascertain and give effect to the intent of the [city leaders]." *Peter Garrett Gunsmith, Inc.*, 98 S.W.3d at 520 (citation omitted).  To ascertain intent, "courts should view the [ordinance] as a whole, considering not only its language but also its spirit. *Id.* (citation omitted).  However, the ordinance's language "bears the greatest importance, and [an ordinance] may not be interpreted in a manner that conflicts with the stated language."  *Id.* (citation omitted).  "Accordingly a court may not insert language to arrive at a meaning different from that created by the stated language in the [ordinance]."  *Id.* (citation omitted).

Neither party disputes that § 95.05 *et seq.*, were amended/enacted as part of a comprehensive deer management plan.  Additionally, there is no dispute that the purpose of amending § 95.05 was to allow private citizens to assist in culling the City's urban deer population.  However, based on the unambiguous language in the ordinances, the Court agrees with the Defendants that § 95.05 regulates the discharge of arrows and not hunting *per se*.  This point is further underscored by the "Archery in Fort Thomas" informational brochure distributed by the  Defendants to explain § 95.05.  [Record No. 23, Ex. 10]  Section One of the pamphlet clearly states that:

---

[11]     While these rules of statutory construction apply in construing state statutes they are also applicable in construing a municipal ordinance.

> The discharge ordinance adopted by council is NOT a deer hunting ordinance. The Kentucky Department of Fish and Wildlife is responsible for regulating hunting in the Commonwealth of Kentucky. Kentucky cities are not permitted by state law to regulate hunting. The ordinance adopted by the City of Fort Thomas instead regulates the discharge of arrows from bows and crossbows.

[*Id.*] (emphasis original)

However, there is some support for the Plaintiffs' assertion that § 95.05 is a thinly-veiled hunting regulation. Notably, the Defendants admit in their motion for summary judgment that the reason for enacting the ordinance was to change the law to allow bow-hunting *as a means of* controlling the deer population. [Record No. 22, p. 4] However, this purpose is not reflected in the ordinance language. In addition, both parties used the terms "hunter, hunt, and hunting" during the preliminary injunction hearing.[12] However, the use of these words alone does not establish that § 95.05 *et seq.*, actually regulate hunting.

Facially, § 95.05 regulates the discharge of arrows at any target within the Fort Thomas city limits, which could include, but is not limited to, deer. In addition, §§ 95.30–32 regulate field dressing, not hunting. The Court is not inclined to give additional meaning to these ordinance when their language is unambiguous. *See Peter Garrett Gunsmith*, 98 S.W.3d at 520. Accordingly, the Court holds that § 95.05 *et seq.*, regulates the discharge of arrows, not hunting, which makes the second step of the analysis is unnecessary. The Plaintiffs have not cited, nor has this Court found, any Kentucky statute prohibiting a city from regulating the discharge of arrows within its city limits. Therefore, the Court holds that § 95.05 *et seq.*, is not preempted by state law, and will grant the Defendants' motion for summary judgment as to this issue.

---

[12]    During the hearing, Police Chief Michael Daley specifically declined to use a term other than "cull."

-21-

### E.      Commerce Clause Allegations

The Plaintiffs argue that § 91.51 and § 91.52 (prohibiting the intentional feeding of deer and requiring the removal of feed and feeding devices accessible to deer) violate the Commerce Clause and, therefore, are unconstitutional.  [Record No. 2, p. 6]  However, the Court disagrees with this argument and will grant summary judgment in favor of the Defendants with respect to this issue.

The Commerce Clause explicitly grants Congress the authority to regulate commerce among the States, and thus implicitly restricts states' and local governments' ability to regulate interstate commerce.  U.S. CONST., art. I, § 8, cl.3; *Huish Detergents, Inc. v. Warren County, Ky.*, 214 F.3d 707, 712 (6th Cir. 2000).  This implied restriction on state and local governments is referred to as the Dormant Commerce Clause.[13]  *Id.*  Sections 91.51 and 91.52 do not discriminate against interstate commerce by treating in-state and out-of-state interests differently.  Therefore, the ordinances do not violate the Commerce Clause unless the burden they impose on interstate commerce is "clearly excessive in relation to the putative local benefits."  *Dep't of Rev. v. Davis*, 128 S. Ct. 1801, 1808 (2008).

In their Response, the Plaintiffs argue that § 91.51 and § 91.52 violate the Commerce Clause, because they claim that the ordinances outlaw the feeding of *migratory birds* from ground feeders.[14]  [Record No. 29, pp.21–24]  Their logic behind this argument is as follows:

---

[13]      *See Huish Detergents*, 214 F.3d at 712 (noting that there is no such thing as the "Dormant Commerce Clause," but that courts have consistently use this inaccurate term).

[14]      The use of migratory birds as the bridge between a statute and the Commerce Clause has been tried before.  *See Hoffman Homes Inc. v. Administrator, U.S.E.P.A.*, 999 F.2d 256 (7th Cir. 1993).

-22-

> Undoubtedly, migratory birds eat at said ground feeders. Therefore[,] by prohibiting the usage of ground feeders the City is causing migratory birds to search further for food possibly even posing a risk to their safety. Thus, not only is the local market for ground feeders affected, but also the market for hunting, trapping, and observing migratory birds is affected. The local transaction is part of a larger transaction and thus a part of interstate commerce, and the effects of the Fort Thomas prohibition are felt in the one billion dollar market revolving around migratory birds.

[*Id.*, pp. 22–23]  The Plaintiffs then assert that the "burden on the one billion dollar migratory bird market when weighed against a benefit the City has chosen not to measure tips the scales of consideration in favor of the Plaintiffs." [*Id.*, p. 23]  Thus, the Plaintiffs conclude that the ordinances violate the Commerce Clause because of an alleged excessive burden they place on interstate commerce.

The Plaintiffs' Commerce Clause arguments are completely frivolous. Sections 91.51 and 91.52 do not prohibit the manufacturing, transportation, sale, purchase, or use of feed or feeding devices. Instead, the sections prohibit City residents from intentionally making food (and food from these items) accessible to deer. Thus, the ordinances do not place *any* direct burden on interstate commerce. An indirect burden *might* occur if City residents chose to stop buying feed or feeders instead of just placing them out of the reach of deer. However, such a speculative result is too far-reaching for this Court to accept when there is no evidence that these ordinances have affected consumer behavior. The Plaintiffs' do present some statistics regarding a possible decline in the *global* bird population by 2100.[15]  Needless to say, any connection

---

[15]   The referenced study lists "habitat loss, disease, climate change, competition from introduced species and exploitation for food or the pet trade" as the reasons for the expected decline in the global bird populations by 2100. Conspicuously absent from this list is any reference to city ordinances requiring citizens to place feed and feeding devices out of reach of deer. *See Science Daily*, December 20, 2004, http://www.sciencedaily.com/releases/2004/12/041220023334.htm.

between the reduction of the global bird population and § 91.51 and § 91.52 is extremely speculative.

Finally, the Plaintiffs ask the Court to assume that the ordinances have a negative impact on migratory birds that would otherwise eat in Fort Thomas from feeders that would have to be removed pursuant to § 91.52.  [Record No. 46, p. 7]  Even if the Court were to make this assumption, a mere scintilla of evidence that a genuine issue of material fact exists is insufficient to defeat a summary judgment motion.  *In re Petty*, 538 F.3d at 439.  The Plaintiffs' evidence that § 91.51 and § 91.52 create an excessive burden on interstate commerce is so scant that a reasonable jury could not find in their favor.

### F.    Allegations Regarding § 91.51(b) and § 91.99(h)

The Plaintiffs contend in their Amended Complaint that § 91.51(b) "is unlawful because it creates a criminal presumption not authorized by the Kentucky Legislature."  Additionally, they contend that § 91.99(h) "is a penalty not authorized by the Kentucky Criminal Code." [Record No. 2, p. 6]  This issue was raised in the Defendants' motion for summary judgment, and was never addressed by the Plaintiffs in either their response or sur-reply.  These allegations are also without merit.

First, § 91.99(h) specifically states that "[a]ny person violating § 91.51 of this Ordinance shall be deemed to have committed a *civil* offense."  [Record No. 22, Ex. X] (emphasis added). Second, the City does not need authorization from the Kentucky Criminal Code to institute the fine in § 91.99(h), because the fine is for a civil offense, not a crime.  A local government's

authority to impose a fine on a person who commits a civil offense by violating a local ordinance comes from KRS 65.8808, and not from the Kentucky Criminal Code.

Because these allegations are without merit, and because the Plaintiffs have failed to respond to the Defendants motion for summary judgment on this issue, the Court grants summary judgment in favor of the Defendants regarding these allegations.

## V.    Qualified Immunity

In addition to seeking the invalidation of the Plan Ordinances, the Plaintiffs also seek damages from the Mayor and Council Members ("City Officials") for their allegedly negligent conduct.  Specifically, the Plaintiffs contend that "if the Court declares and determines that the City Officials knew, or should have known, that the legislation they were adopting was preempted by state law, then they should be liable individually and not at the expense and cost of the City of Fort Thomas for adopting this ordinance." [Record No. 2, p. 10]

As mentioned above, this Court previously held that the City Officials were entitled to absolute legislative immunity with respect to all federal claims asserted against them in their individual capacities. [Record No. 20, p. 6]  However, because Kentucky law does not extend absolute legislative immunity to municipal legislatures, their motion to dismiss the state claims asserted against them in their individual capacity was denied. [*Id.*, pp. 6–7]  Since the issue of qualified immunity was not raised in their motions to dismiss, the Court did not address whether the City Officials were entitled to qualified immunity in its July 30, 2008, memo opinion. [*Id.*, p. 7]  This issue has now been properly raised in the motion for summary judgment. [Record No. 22, pp. 27–30]

Kentucky law provides a public official sued in his or her individual capacity with qualified immunity, which affords protection for good faith judgment calls made in a legally uncertain environment. *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (citations omitted). Thus, public officials are entitled to qualified official immunity "for negligent conduct when the negligent act or omissions were (1) discretionary acts or functions, that (2) were made in good faith (i.e. were not made in "bad faith"), and (3) were within the scope of the employee's authority." *Id.* (*citing Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). Since the City Officials' actions meet these three factors, qualified immunity applies even if the Court holds that the Plan Ordinances were negligently adopted.

The adoption of the Plan Ordinances constitutes discretionary acts within the scope of the City Officials' authority. Concerned about the problems associated with increasing deer populations, the City Officials considered a variety of means to deal with the problem. [*See* Record No. 22; Exhibits H, I, J S, T, U.] After nearly a year of planning, meetings, and public hearings, the City Officials decided to adopt the three-pronged Plan. Along with the authority to evaluate alternatives and select a particular course of action comes the wide discretion to adopt ordinances to promote the general welfare of the people. *See Lexington Fayette County Food & Bev. Ass'n*, 131 S.W.3d at 749. Second-guessing the City Officials regarding whether the Plan contains the "best" set of alternatives is irrelevant. "The power to exercise honest discretion necessarily includes the power to make an honest mistake in judgment." *James v. Wilson*, 95 S.W.3d 875, 910 (Ky. Ct. App. 2002) (citation omitted).

Once a public official has shown *prima facie* that an act was performed within the scope of his or her discretionary authority, "the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Sloas*, 201 S.W.3d at 481 (*quoting Yanero*, 65 S.W.3d at 523). "Thus, the proof required necessarily focuses on 'bad faith,' rather than 'good faith.'" *Id.* And as the Kentucky Supreme Court notes, in most cases, "good faith" is merely a presumption that exists in the absence of evidence showing "bad faith." *Id.* at 475. An action by a public official is done in bad faith when the official either "willfully or maliciously intended to harm the plaintiff," or where the official "acted with a corrupt motive." *Id.* at 481. In addition, to find bad faith there "must be some implication of self-interest, or a deliberate indifference, or sinister motive, rather than an honest mistake or oversight." *Id.* at 485.

In the present case, there is no evidence suggesting that any City Officials acted in bad faith when he or she voted to adopt the Plan. The basis of the Plaintiffs' claim for damages in the Amended complaint is that the City Officials "knew, or should have known, that the legislation they were adopting was preempted by state law." However, "officials are not liable for bad guesses in gray areas, and most government officials are not expected to engage in the kind of legal scholarship normally associated with law professors and academicians." *Id.* at 475. Thus, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (*quoting Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). Since there is no evidence of bad faith, the Court may presume that the City Officials acted in good faith when

adopting the Plan.  *See Id.* at 475 (good faith is merely a presumption that exists in the absence of a showing of bad faith).

In summary, the Court holds that adopting the Plan Ordinances were discretionary acts done within the scope of the City Officials' authority, and that these acts were done in good faith.  Thus, the Mayor and Council Members are entitled to qualified immunity against all state claims asserted against them in their individual capacities.  Based on this holding, and the holding in this Court's July 30, 2008 Memorandum Opinion and Order, all claims asserted against the Mayor and Council Members in their individual capacities are dismissed.

## VI.    Conclusion

Based on the foregoing analysis of the issues presented by the parties, it is hereby

**ORDERED** as follows:

(1)    The Defendants' motion for summary judgment is **DENIED** regarding the issue of whether § 91.51 is preempted by state law.  With respect to all other issues presented, the Defendants' motion for summary judgment [Record No. 22] is **GRANTED**.

(2)    All state law claims asserted against the Mayor and Council Members in their individual capacities are **DISMISSED**.

This 8th day of January, 2009.



Signed By:

*Danny C. Reeves*

United States District Judge